UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ABB INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 4:19-cv-4109 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| JRGO, LLC, ANDRE FILIATRAULT, and | ) | |
| ZACHARY MCKEE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT AND APPLICATION FOR PRELIMINARY
AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff ABB Inc., ("ABB") for its Complaint against Defendants, JRGO, LLC ("JRGO"),

Andre Filiatrault and Zachary McKee, states and alleges as follows:

STATEMENT OF THE CASE

1.     Just weeks ago, two key employees from ABB's oil and gas pipeline inspection

business announced sudden resignations from ABB. These employees, Defendants Andre

Filiatrault and Zachary McKee, announced that they were joining forces with Defendant JRGO.

Mr. Filiatrault brazenly bragged that, once Mr. Filiatrault and Mr. McKee joined JRGO, JRGO

would soon "be competing with" ABB's oil and gas pipeline business.

2.     A review of Mr. Filiatrault and Mr. McKee's electronic devices, including their

work computers, reveals that, in the days leading to their resignation, both had downloaded

substantial files from these computers onto private, non-ABB electronic storage devices. Current

investigation has revealed that Mr. Filiatrault downloaded, without ABB's authorization, at least

8,100 electronic files. Current investigation reveals that Mr. McKee may have downloaded more

than 1.2 million files, without ABB's authorization.

3.      ABB's investigation of Mr. McKee's and Mr. Filiatrault's improper copying, distribution, and use continues. However, it is apparent that both Mr. Filiatrault and Mr. McKee have downloaded and copied voluminous confidential, trade secret files belonging to ABB. Neither the copying, use, nor distribution of this information has been with ABB's authorization.

4.      Upon information and belief, including from comments made by Mr. Filiatrault, JRGO specifically targeted Mr. Filiatrault and Mr. McKee, as well as other ABB employees, knowing that they possessed confidential, trade secret information of ABB.

5.      Defendants' recent actions and ongoing conduct threatens irreparable harm to ABB. This lawsuit is brought to prevent that outcome.

### THE PARTIES

6.      ABB is a corporation duly organized and existing under the laws of the State of Delaware, having its principal place of business located at 305 Gregson Drive, Cary, North Carolina 27511.

7.      Andre Filiatrault is an individual and, upon information and belief, resides at 1322 Wealden Forest Drive, Spring, Texas 77379.

8.      Zachary McKee is an individual and, upon information and belief, resides at 31 Quiet Wind Drive, Montgomery, Texas 77356.

9.      JRGO, LLC is a limited liability company organized under the laws of the State of Florida and having a principal place of business at 2193 Northway Drive, Mt. Pleasant, Michigan 48858. JRGO also maintains an office at 3560 Cardinal Point Drive, Suite 201, Jacksonville, Florida 32257. JRGO can be served in Michigan through its registered agent John R. Glese, 2193 Northway Drive, Mt. Pleasant, Michigan 48858 and can be served in Florida through its registered agent Brant, Reiter, McCormick & Johnson, P.A., 135 West Bay Street, Suite 400, Jacksonville, Florida 32202.

## JURISDICTION AND VENUE

10.     This action includes claims brought pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq., the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, et seq., and the Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code Ann. § 134A.001.

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the Defend Trade Secret Act and Computer Fraud and Abuse Act are under Federal law, and the doctrines of supplemental jurisdiction because the state law claims are related to the federal claims in that they perform part of the same case or controversy and derive from a common nucleus of operative facts. 28 U.S.C. § 1367.

12.     This Court has personal jurisdiction over Andre Filiatrault because he has committed acts of trade secret misappropriation, violations of the Computer Fraud & Abuse Act, and violations of the other state law claims stated herein, within this District.

13.     This Court has personal jurisdiction over Zachary McKee because he has committed acts of trade secret misappropriation, violations of the Computer Fraud & Abuse Act, and violations of the other state law claims stated herein, within this District.

14.     This Court has personal jurisdiction over JRGO because it has committed acts of trade secret misappropriation, violations of the Computer Fraud & Abuse Act, and violations of the other state law claims stated herein, within this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

**A.      ABB Is a Leader in Many Industries Across the United States**

16.     ABB is one of the most innovative technology companies in America. ABB technology helped to create the power infrastructure in the United States, and it keeps the nation's electrical grid up and running.

17.     Although ABB's headquarters is in North Carolina, it maintains a significant presence is Houston, TX. ABB employs hundreds of people in its Houston facilities, and much of the work of ABB's Houston facilities is directed to the country's oil and gas industry.

18.     ABB provides a critical technological component to the U.S. energy industry. For example, after Hurricane Sandy knocked out a Con Edison substation in lower Manhattan, ABB completed an upgrade to a digitalized, more stormproof substation utilizing a new innovative design. This design allows for more efficient monitoring, in real time, of data and further managed the flow of electricity and to avoid power outages by anticipating failures before they occur.

19.     On the West Coast, innovative ABB transmission systems carry clean hydroelectricity from the Pacific Northwest to metropolitan Los Angeles. During winter months, when the heating season creates greater demand for power in Oregon and Washington, the ABB technology can help direct the energy flow in the other direction, along the same pathway.

20.     Near Detroit, Michigan, ABB operates on the world's most sophisticated factories, making industrial robots. These robots can be used by automakers and other manufacturers, as well as in a variety of other industries.

21.     ABB's technological advances can be found in use throughout the oil and gas industry, as well. Oil and gas fields frequently experience extreme outdoor conditions, such as intense cold, ice and snow, searing heat, heavy dust, and strong winds. Despite these extreme outdoor conditions, it remains important to maintain communications with oil and gas field and pipeline distribution. Ideally, wireless oil and gas communication networks can deliver broadband speeds and form a scalable foundation to securely support multiple applications that increase operational efficiency and safety on cost-effective infrastructures.

**B.** **ABB's Industry-Leading Pipeline Inspection Business**

22.     As part of its oil and gas industry presence, ABB maintains a pipeline inspection business. Through its pipeline inspection business, ABB helps oil and gas pipeline owners to identify, analyze, and redress, where necessary, anomalies or possible defects. ABB's oil and gas inspection business team collects information and data from pipeline owners and conducts on-site inspections. These inspections can be used to verify anomalies, and potentially damaging defects, that exist in oil and gas pipelines. Ex. 1, Bishop Decl. at ¶ 5.

23.     In conducting its services, ABB collects pipeline data from the on-site inspections. This data can be used to perform various analytics that allows ABB to assist customers in cost-efficiently addressing pipeline anomalies and defects. Ex. 1, Bishop Decl. at ¶ 6.

24.     The data collected by ABB is also used in developing trending and predictive models that can assist customers, in advance of any anomaly detection, by predicting future pipeline defects. This analytic tool allows ABB's customers to save money, and potentially avoid damaging or catastrophic failures in the field. Ex. 1, Bishop Decl. at ¶ 7.

25.     The data collected by ABB is managed by a software product called PITware, a proprietary analytics tool used only by ABB. Ex. 1, Bishop Decl. at ¶ 8.

26.     ABB owns all rights in the PITware software. Ex. 1, Bishop Decl. at ¶ 9.

27.     The PITware software was originally developed by General Electric, utilizing a third-party vendor. Ex. 1, Bishop Decl. at ¶ 10.

28.     ABB acquired the PITware software, and all of the other business information associated with the oil and gas inspection business, from General Electric. Ex. 1, Bishop Decl. at ¶ 11.

29.     The PITware software allows ABB to perform numerous studies, analytics, forecasts, and other data that is critically important to owners of oil and gas pipelines. This

information allows pipeline owners to efficiently and effectively identify and, if necessary, redress anomalies or defects in the pipeline. The PITware software also allows customers to predict, and plan for, potential pipeline anomalies in the future. Ex. 1, Bishop Decl. at ¶ 12.

30.     At all times since the acquisition of the PITware software, ABB has maintained the software as a secret. Ex. 1, Bishop Decl. at ¶ 13.

31.     For example, ABB has restricted its employees' access to the PITware software. Further, ABB has required employees having access to the information to be subject to non-disclosure requirements, and a Code of Conduct. Ex. 1, Bishop Decl. at ¶ 14.

32.     PITware is valuable to ABB and provides ABB's oil and gas pipeline inspection business with competitive advantages over competing oil and gas pipeline inspection businesses offered by other companies who are already in the inspection business or who are entering or contemplating entry into the inspection business. For example, the PITware software allows ABB's field engineers to quickly identify and diagnose anomalies at specific sites, permitting ABB's field engineers the ability to provide diagnoses and recommendations regarding corrective actions with speed and efficiency. The PITware software is a critical component of ABB's oil and gas pipeline inspection business. Ex. 1, Bishop Decl. at ¶ 15.

33.     ABB also collects and maintains additional information concerning its oil and gas inspection business. For example, ABB collects and maintains information concerning pricing of its services ("Pricing Information"). Ex. 1, Bishop Decl. at ¶ 16.

34.     ABB's Pricing Information is confidential, valuable to ABB, and would be valuable to competitors or potential competitors. Ex. 1, Bishop Decl. at ¶ 17.

35.     ABB maintains its Pricing Information as confidential information. For example, ABB has restricted its employees' access to the Pricing Information. Further, ABB has required

employees having access to the information to be subject to non-disclosure requirements, and a Code of Conduct. Ex. 1, Bishop Decl. at ¶ 18.

36.    ABB's Pricing Information is valuable to ABB and provides ABB's oil and gas pipeline inspection business with a competitive advantage over those in a similar field, or contemplating entry into the field. ABB's Pricing Information provides ABB with the information necessary to set competitive pricing guidelines, and to know where pricing pressure points may be found. Ex. 1, Bishop Decl. at ¶ 19.

37.    ABB also maintains employee files, which include confidential employee information, credentials and certifications ("Employee Files"). Ex. 1, Bishop Decl. at ¶ 20.

38.    ABB's Employee Files are confidential, valuable to ABB, and would be valuable to competitors or potential competitors. Ex. 1, Bishop Decl. at ¶ 21.

39.    ABB maintains its Employee Files as confidential information. For example, ABB has restricted its employees' access to the Employee Files. Further, ABB has required employees having access to the information to be subject to non-disclosure requirements, and a Code of Conduct. Ex. 1, Bishop Decl. at ¶ 22.

40.    ABB's Employee Files are valuable to ABB and provide ABB's oil and gas pipeline inspection business with a competitive advantage over its competitors or those seeking entry into the field. ABB's Employee Files contains key information concerning its employees' skill sets, certifications, and terms of employment that allow ABB to field a skilled workforce. Ex. 1, Bishop Decl. at ¶ 23.

41.    ABB has collected and maintained information directed to a new business initiative ("Fire Tube Files"). Ex. 1, Bishop Decl. at ¶ 24.

42.     ABB's Fire Tube Files are confidential, valuable to ABB, and would be valuable to a competitor or potential competitors. Ex. 1, Bishop Decl. at ¶ 25.

43.     ABB maintains its Fire Tube Files as confidential information. For example, ABB has restricted its employees' access to the Fire Tube Files. Further, ABB has required employees having access to the information to be subject to non-disclosure requirements, and a Code of Conduct. Ex. 1, Bishop Decl. at ¶ 26.

44.     ABB's Fire Tube Files are valuable to ABB and provide ABB's oil and gas pipeline inspection business with a competitive advantage over competitors or those seeking entry into the field. ABB's Fire Tube Files include information detailing new data and business plans generated by ABB for a new business initiative concerning. The data and information contained within the Fire Tube Files is a critical component of ABB's new Fire Tube File initiative. Ex. 1, Bishop Decl. at ¶ 27.

**C.     Defendants' Misappropriation of ABB's Confidential and Trade Secret Information**

45.     Defendant, Andre Filiatrault was employed by ABB from approximately July 1, 2018 through approximately August 2019. At all times of his employment, Mr. Filiatrault was subject to ABB's Code of Conduct. Ex. 1, Bishop Decl. at ¶ 28.

46.     On or about August 26, 2019, Mr. Filiatrault informed his immediate manager, Neal Bishop, that he was ending his employment at ABB, and had accepted a position at defendant JRGO LLC. Ex. 1, Bishop Decl. at ¶ 29

47.     At the time he announced his departure, Mr. Filiatrault informed Mr. Bishop that, at that time, JRGO did not have an oil and gas pipeline inspection business, but that Mr. Filiatrault had been hired to start such a business offering. Mr. Filiatrault informed Mr. Bishop that JRGO would "soon be competing" with ABB for this business. Ex. 1, Bishop Decl. at ¶ 30.

48.     Prior to joining ABB, Mr. Filiatrault was employed by General Electric. While employed by General Electric, Mr. Filiatrault was involved in General Electric's oil and gas pipeline inspection business. Mr. Filiatrault was subject to General Electric's Employee Innovation and Proprietary Information Agreement. Ex. 1, Bishop Decl. at ¶ 31.

49.     Upon information and belief, Mr. Filiatrault was intimately involved in the design and development of the ABB PITware software, as well as in developing customer relationships, developing proprietary customer data, and other sensitive and confidential materials used by General Electric and, subsequently, ABB, in its oil and gas inspection business. Ex. 1, Bishop Decl. at ¶ 32.

50.     In the weeks leading up to his resignation, Mr. Filiatrault was disgruntled with his position at ABB. Mr. Filiatrault repeatedly expressed concerns with his role within ABB, and the future of ABB's oil and gas business. Ex. 1, Bishop Decl. at ¶ 33.

51.     At all times during his employment at ABB, Mr. Filiatrault had complete access to all of ABB's confidential business information, including the PITware software and its source code, ABB's Pricing Information, Employment Files and Fire Tube Files. Ex. 1, Bishop Decl. at ¶ 34.

52.     Shortly before resigning from ABB, Mr. Filiatrault copied several files from his work computer onto a non-ABB storage device. This information included detailed information concerning the PITware software as well as ABB's confidential information concerning ABB's Pricing Information, Employee Files, and Fire Tube Files, and other confidential business information related to the ABB oil and gas business. Ex. 1, Bishop Decl. at ¶ 35.

53.     Upon information and belief, Mr. Filiatrault made copies, distributed copies, and used the information copied from his work computer onto the non-ABB storage device, and has

used this information in conjunction with his employment at JRGO and in conjunction with JRGO's development of its oil and gas inspection business, all without ABB's authority. Ex. 1, Bishop Decl. at ¶ 36.

54.     Upon information and belief, Mr. Filiatrault intended to, and has, used ABB's confidential and trade secret information, including information concerning the PITware software, ABB's Pricing Information, Employment Files and Fire Tube Files, without ABB's authority. Ex. 1, Bishop Decl. at ¶ 37.

55.     Upon information and belief, Mr. Filiatrault intended to, and has, used ABB's confidential and trade secret information, including information concerning the PITware software, ABB's Pricing Information, Employment Files and Fire Tube Files without ABB's consent or authorization, including making copies of this information, distributing this information, and using this information to assist JRGO in developing its oil and gas inspection business. Ex. 1, Bishop Decl. at ¶ 38.

56.     Defendant, Zachary McKee was employed by ABB from approximately July 1, 2018 through approximately August 2019. At all times of his employment, Mr. McKee was subject to ABB's Code of Conduct. Prior to his employment with ABB, Mr. McKee was employed in a similar role within General Electric's oil and gas pipeline inspection business. Ex. 1, Bishop Decl. at ¶ 39.

57.     On or about August 26, 2019, Mr. McKee informed his immediate manager, Andre Filiatrault, that he was ending his employment at ABB, and had accepted a position at defendant JRGO LLC. Ex. 1, Bishop Decl. at ¶ 40.

58.     Prior to joining ABB, Mr. McKee was employed by GE. While employed by General Electric, Mr. McKee was subject to General Electric's Employee Innovation and Proprietary Information Agreement. Ex. 1, Bishop Decl. at ¶ 41.

59.     Upon information and belief, Mr. McKee was intimately involved in the design and development of the ABB PITware software, as well as in developing customer relationships, developing proprietary customer data, and other sensitive and confidential materials used by General Electric and, subsequently, ABB, in its oil and gas inspection business. Ex. 1, Bishop Decl. at ¶ 42.

60.     At all times during his employment at ABB, Mr. McKee had complete access to all of ABB's confidential business information, including the PITware software and its source code, ABB's Pricing Information, Employee Files and Fire Tube Files. Ex. 1, Bishop Decl. at ¶ 43.

61.     Upon information and belief, Mr. McKee intended to, and has, used ABB's confidential and trade secret information, including information concerning the PITware software, ABB's Pricing Information, Employee Files and Fire Tube Files, all without ABB's authority. Ex. 1, Bishop Decl. at ¶ 44.

62.     Upon information and belief, Mr. McKee intended to, and has, used ABB's confidential and trade secret information, including information concerning the PITware software, ABB's Pricing Information, Employee Files and Fire Tube Files without ABB's consent or authorization, including making copies of this information, distributing this information, and using this information to assist JRGO in developing its oil and gas inspection business. Ex. 1, Bishop Decl. at ¶ 45.

63.     While he was employed by ABB, Mr. McKee reported directly to Mr. Filiatrault. Shortly before resigning from ABB, Mr. McKee copied several files from his work computer onto

a non-ABB storage device. This information included detailed information concerning the PITware software, including source code, as well as confidential information concerning ABB's Pricing Information, Employee Files and Fire Tube Files, and other confidential business information related to the ABB oil and gas business. Ex. 1, Bishop Decl. at ¶ 46.

64.     Upon information and belief, Mr. McKee made, used and distributed copies of the information contained on the electronic device, and has used information from the electronic device, including in conjunction with his employment at JRGO and in conjunction with JRGO's development of its oil and gas inspection business, all without ABB's authority. Ex. 1, Bishop Decl. at ¶ 47.

65.     Upon information and belief, Mr. Filiatrault and Mr. McKee exchanged communications, both prior to and subsequent to, their announced departures from ABB, concerning their use of information relating to ABB's PITware software, customer information, pricing information and other ABB confidential information, without ABB's authority. Ex. 1, Bishop Decl. at ¶ 48.

66.     Upon information and belief, JRGO was aware, or should have been aware, that Mr. Filiatrault and Mr. McKee possessed ABB's trade secret information. Ex. 1, Bishop Decl. at ¶ 49.

67.     Upon information and belief, JRGO knew that Mr. Filiatrault and Mr. McKee possessed valuable, confidential information concerning ABB's oil and gas pipeline inspection business. Ex. 1, Bishop Decl. at ¶ 50.

68.     Upon information and belief, JRGO hired Mr. Filiatrault and Mr. McKee because they possessed valuable, confidential information concerning ABB's oil and gas pipeline inspection business. Ex. 1, Bishop Decl. at ¶ 51.

69.     Upon information and belief, JRGO hired Mr. Filiatrault and Mr. McKee in order to establish an oil and gas pipeline inspection business. Ex. 1, Bishop Decl. at ¶ 52.

70.     Upon information and belief, JRGO intended to, and has, used ABB's confidential and trade secret information, including ABB's pricing information, employee files, Fire Tube information, and PITware software, in order to establish a competing oil and gas pipeline inspection business. Ex. 1, Bishop Decl. at ¶ 53.

71.     After Mr. Filiatrault and Mr. McKee resigned from ABB, as part of the employee exit process, Data Loss Prevention (DLP) reports were generated from Mr. Filiatrault and Mr. McKee's computers. The forensic analysis identified significant risk of improper activity. Ex. 1, Bishop Decl. at ¶ 54.

72.     The forensic analysis on Mr. Filiatrault's computer identified several instances of wholesale copying of ABB's confidential information. Ex. 1, Bishop Decl. at ¶ 55.

73.     The forensic analysis established that Mr. McKee downloaded over 1.2 million files onto the personal storage device. Ex. 1, Bishop Decl. at ¶ 56.

74.     Shortly after serving their resignations, both Mr. McKee and Mr. Filiatrault were contacted by ABB. Ex. 1, Bishop Decl. at ¶ 57.

75.     Mr. McKee was asked about the files downloaded onto the personal electronic storage device and, approximately one week later, Mr. McKee sent to ABB, via mail, an electronic storage device. Ex. 1, Bishop Decl. at ¶ 58.

76.     Mr. Filiatrault and Mr. McKee both returned their work cell phones to ABB after serving their notices of resignation. However, prior to returning the cell phones, Mr. Filiatrault and Mr. McKee attempted to "wipe clean" the phones, and thereby attempted to remove all recoverable evidence of prior communications. Ex. 1, Bishop Decl. at ¶ 59.

77.     After Mr. McKee tendered his resignation, ABB learned that Mr. McKee had uploaded details concerning the PITware software product to a DropBox.com location. The DropBox site is not maintained by ABB. Ex. 1, Bishop Decl. at ¶ 60.

78.     DropBox.com is not an authorized location for the storage of ABB's confidential and trade secret information. Ex. 1, Bishop Decl. at ¶ 61.

79.     Upon information and belief, DropBox.com was not an authorized location for the storage of GE's confidential and trade secret information. Ex. 1, Bishop Decl. at ¶ 62.

80.     At no time did ABB give Mr. McKee or any other person the authority to load ABB's confidential and trade secret information on the DropBox site. Ex. 1, Bishop Decl. at ¶ 63.

81.     Upon information and belief, Mr. McKee created the DropBox site personally for his benefit and for the benefit of the other Defendants, or for other third parties. Ex. 1, Bishop Decl. at ¶ 64.

82.     Upon information and belief, anyone possessing the appropriate URL could access the materials posted on the DropBox site. Ex. 1, Bishop Decl. at ¶ 65.

83.     The materials posted on the DropBox site include full and extensive details of the "PITware Build Version 86.0.2." Ex. 1, Bishop Decl. at ¶ 66.

84.     The materials posted on the DropBox site were copied, without authorization, from ABB computers, without ABB's authorization. Ex. 1, Bishop Decl. at ¶ 67.

85.     The materials posted on the DropBox site have been copied and distributed by Mr. McKee, without ABB's authorization. Ex. 1, Bishop Decl. at ¶ 68.

86.     Upon information and belief, Mr. McKee has controlled, and continues to control, the contents of the DropBox site. Ex. 1, Bishop Decl. at ¶ 69.

FIRST CAUSE OF ACTION

**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1831 et seq. Against Each Defendant**

87.     Plaintiff repeats and realleges each and every allegation made in the previous paragraphs as if fully written herein.

88.     ABB possesses valuable trade secrets, including but not limited to, information concerning the PITware software, Pricing Information, Employment Files, and Fire Tube Files.

89.     ABB used its trade secret information to provide services in Texas, and in interstate commerce, and continued to do so.

90.     ABB took reasonable steps to maintain the secrecy of its trade secrets, including the trade secret information misappropriated by the Defendants. ABB limited the internal use and dissemination of its trade secret information, and required its employees having access to such information to agree to maintain ABB's trade secrets confidential.

91.     Defendants Filiatrault and McKee, while employed by ABB, had complete access to all of ABB's trade secret information.

92.     Defendants Filiatrault and McKee knew the value of ABB's trade secrets, both to ABB and to ABB's competitors.

93.     During their employment at ABB, Defendants Filiatrault and McKee used improper means to acquire, copy, distribute, and use ABB's valuable trade secrets, knowing that it was in violation of ABB's practices, procedures, and policies, and without ABB's authority.

94.     Defendants Filiatrault and McKee acted intentionally and maliciously in their misappropriation of ABB's trade secrets.

95.     Defendants Filiatrault and McKee, in cooperation with Defendant JRGO, have misappropriated, used, and continue to use ABB's trade secrets, throughout the United States and in Texas, while knowing or having reason to know that the information was derived from McKee

and Filiatrault, who used improper means to acquire it, or who acquired the trade secret information under circumstances giving rise to a duty to maintain its secrecy and limit its use.

96.     Upon information and belief, Defendants Filiatrault, McKee, and JRGO have used ABB's trade secrets to benefit themselves, and to solicit and induce actual and prospective customers of ABB, to take or transfer business from ABB to JRGO.

97.     At no time has ABB authorized Defendants Filiatrault and McKee to disclose its confidential and trade secret information to JRGO. At no time after their departure from ABB has ABB authorized Filiatrault and McKee to continue to have access to, use, or distribute ABB's confidential and trade secret information.

98.     At no time has ABB authorized Defendant JRGO to have access to, use, or distribute ABB's confidential and trade secret information.

99.     ABB faces a real threat that Defendants Filiatrault, McKee and JRGO will use, continue to use, and disclose ABB's trade secrets to benefit themselves to ABB's detriment.

100.    Defendants Filiatrault and McKee knew that the information appropriated was confidential to ABB, constituted ABB's trade secrets, and that they were not authorized to possess, use or disclose ABB's trade secret information beyond the scope of their employment with ABB.

101.    Upon information and belief, JRGO knew, or reasonably should have known, that JRGO was improperly acquiring, and using, ABB's trade secret information, through its hiring and employment of Defendants Filiatrault and McKee.

102.    JRGO knew, or should have known, that Filiatrault and McKee improperly brought to JRGO ABB's trade secret information, without authorization from ABB and in violation of ABB's rights.

103.    Defendants Filiatrault, McKee and JRGO engaged in the misappropriation described above with willful, malicious and improper motives, and with reckless indifference to ABB's rights.

104.    As a direct and foreseeable result of Defendants' misappropriation, ABB has suffered irreparable harm, injuries and damages, and will continue to suffer irreparable harm, injury, and damages, including but not limited to the loss of relevant market share, injury to business reputation and goodwill, and attorneys' fees and costs.

105.    ABB is entitled to injunctive relief, and to recover actual damages, exemplary damages, and attorneys' fees, in an amount to be established at trial.

### SECOND CAUSE OF ACTION
### Violation of Texas Uniform Trade Secret Act, Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq*. Against Each Defendant

106.    Plaintiff repeats and realleges each and every allegation made in the previous paragraphs as if fully written herein.

107.    ABB possesses valuable trade secrets, including but not limited to, information concerning the PITware software, Pricing Information, Employment Files, and Fire Tube Files.

108.    ABB used its trade secret information to provide services in Texas, and in interstate commerce, and continued to do so.

109.    ABB took reasonable steps to maintain the secrecy of its trade secrets, including the trade secret information misappropriated by the Defendants. ABB limited the internal use and dissemination of its trade secret information, and required its employees having access to such information to agree to maintain ABB's trade secrets confidential.

110.    Defendants Filiatrault and McKee, had complete access to all of ABB's trade secret information.

111.    Defendants Filiatrault and McKee knew the value of ABB's trade secrets, both to ABB and to ABB's competitors.

112.    During their employment at ABB, Defendants Filiatrault and McKee used improper means to acquire, copy, distribute, and use ABB's valuable trade secrets, knowing that it was in violation of ABB's practices, procedures, and policies, and without ABB's authority.

113.    Defendants Filiatrault and McKee acted intentionally and maliciously in their misappropriation of ABB's trade secrets.

114.    Defendants Filiatrault and McKee, in cooperation with Defendant JRGO, have misappropriated, used, and continue to use ABB's trade secrets, throughout the United States and in Texas, while knowing or having reason to know, that the information was derived from McKee and Filiatrault, who used improper means to acquire it, or who acquired the trade secret information under circumstances giving rise to a duty to maintain its secrecy and limit its use.

115.    Upon information and belief, Defendants Filiatrault, McKee, and JRGO have used ABB's trade secrets to benefit themselves, and to solicit and induce actual and prospective customers of ABB, to take or transfer business from ABB to JRGO.

116.    At no time has ABB authorized Defendants Filiatrault and McKee to disclose its confidential and trade secret information to JRGO. At no time after their departure from ABB has ABB authorized Filiatrault and McKee to continue to have access to, use, or distribute ABB's confidential and trade secret information.

117.    At no time has ABB authorized Defendant JRGO to have access to, use, or distribute ABB's confidential and trade secret information.

118.    ABB faces a real threat that Defendants Filiatrault, McKee and JRGO will use, continue to use, and disclose ABB's trade secrets to benefit themselves to ABB's detriment.

119.     ABB has suffered and will continue to suffer irreparable harm that cannot be measured in precise monetary damages.

120.     ABB is entitled to immediately injunctive relief to prevent further irreparable harm.

121.     Defendants Filiatrault and McKee knew that the information appropriated was confidential to ABB, constituted ABB's trade secrets, and that they were not authorized to possess, use or disclose ABB's trade secret information beyond the scope of their employment with ABB.

122.     Upon information and belief, JRGO knew, or reasonably should have known, that JRGO was improperly acquiring, and using, ABB's trade secret information, through its hiring and employment of Defendants Filiatrault and McKee.

123.     JRGO knew, or should have known, that Filiatrault and McKee improperly brought to JRGO ABB's trade secret information, without authorization from ABB and in violation of ABB's rights.

124.     Defendants Filiatrault, McKee and JRGO engaged in the misappropriation described above with willful, malicious and improper motives, and with reckless indifference to ABB's rights.

125.     As a direct and foreseeable result of Defendants' misappropriation, ABB has suffered irreparable harm, injuries and damages, and will continue to suffer irreparable harm, injury, and damages, including but not limited to the loss of relevant market share, injury to business reputation and goodwill, and attorneys' fees and costs.

126.     ABB is entitled to recover actual damages, exemplary damages, and attorneys' fees, in an amount to be established at trial.

### THIRD CAUSE OF ACTION
### Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Against Each Defendant

127.   Plaintiff repeats and realleges each and every allegation made in the previous paragraphs as if fully written herein.

128.   In the weeks before their employment with ABB ended, Defendants Filiatrault and McKee obtained a significant amount of data containing Plaintiff's confidential information and trade secrets from their work computers and from ABB's network of electronically stored data.

129.   Defendants Filiatrault and McKee did not have authorization to access, copy, distribute or disclose the obtained electronic information in order to use in competition against ABB. The actions of McKee and Filiatrault were in direct violation of policies set forth by ABB, and the terms of their employment with ABB.

130.   By improperly obtaining the electronically stored information, Defendants Filiatrault and McKee knowingly, and with intent to defraud, accessed ABB's protected computer systems without authorization and/or in excess of authorized access.

131.   ABB has incurred, and will continue to incur, significant expense in discovering and protecting the information that was improperly obtained by Defendants Filiatrault and McKee, which will result in expenses that have exceeded $5,000 from September 1, 2019 to the date of filing this complaint.

132.   ABB conducted an investigation and damage assessment, which is ongoing. The investigation and damage assessment included forensic examinations of protected computers and other electronic devices which had been used by Defendants McKee and Filiatrault. The investigation and damage assessment has been at considerable cost and expense to ABB, and has caused interruption in service of ABB's computer network systems.

133.    ABB's investigation determined that Defendants McKee and Filiatrault had accessed their protected computers and/or computer systems without authorization or exceeding their authorization from ABB, and obtained ABB's electronically stored information, including its valuable trade secrets and other confidential and proprietary business information.

134.    The investigation continues, and has required ABB's executives, in-house attorneys, managers and information technology professionals, to spend hours of valuable time away from day-to-day responsibilities.

135.    Plaintiff is thus entitled to all relief available under the Computer Fraud and Abuse Act. Plaintiff is entitled to actual and statutory damages, costs, interest, attorneys' fees, and a preliminary and permanent injunction requiring the return of and further enjoining the use of ABB's trade secrets, and other confidential and proprietary business information which were stored electronically on ABB's computers.

APPLICATION FOR PRELIMINARY INJUNCTION

136.    ABB believes that an efficient approach to its request for preliminary injunction, given what ABB knows at this time, is for the Court to order expedited discovery and set a preliminary injunction hearing forty-five (45) days after the filing of this Application for Preliminary of Permanent Injunctive Relief. Accordingly, ABB files contemporaneously with the Complaint and Application for Preliminary and Permanent Injunction a Motion for Expedited Discovery and requests that this Court set a preliminary injunction hearing during the week of December 2, 2019.

### A.    Legal Standards

#### 1.    Requirements for Preliminary Injunction

137.    "A party seeking a preliminary injunction must establish the following elements: (1) a substantial likelihood that the party will prevail on the merits; (2) a substantial threat that

irreparable harm will result if the injunction is not granted; (3) the threatened injury outweighs the threatened harm to the nonmovants; and (4) granting the preliminary injunction will not disserve the public interest." *Glycobiosciences, Inc. v. Woodfield Pharmaceutical, LLC*, 2016 WL 1702674, at *8 (S.D. Tex. Apr. 27, 2016); *see also Daniels Health Sciences, LLC v. Vascular Health Sciences, LLC,* 710 F.3d 579, 582 (5th. Cir. 2013). The party seeking an injunction has the burden of persuasion, but "a movant is not required to prove its case in full at a preliminary injunction hearing." *Glycobiosciences*, 2016 WL 1702674, at *2.

138.    "The damages occasioned by a case involving breach of confidentiality and misappropriation of trade secrets is, by its nature, irreparable and not susceptible of adequate measurement for remedy at law." *Glycobiosciences*, 2016 WL 1702674, at *8. Even the threat of disclosure of trade secrets "constitutes irreparable injury as a matter of law." Id. at *8. A preliminary injunction is particularly appropriate when a former employee "takes confidential information and trade secrets while pursuing employment with industry competitors." Chevron U.S.A., Inc. v. Guajardo, 2017 WL 2265694, at *2 (S.D. Tex. May 24 2017). "Courts have found that the balance of hardships tips in favor of a plaintiff seeking an injunction which would merely prohibit the defendants from misappropriating the trade secrets of the plaintiff." Id. at *3 (internal quotations and citation omitted).

## 2.    Misappropriation of Trade Secrets

139.    Under the Defend Trade Secrets Act ("DTSA"), the owner of a trade secret that is misappropriated may bring a civil action and receive injunctive relief if the trade secret is related to a product or service used in interstate commerce. 18 U.S.C. § 1836(b) (2019). The Texas Uniform Trade Secret Act ("TUTSA") similarly allows for civil action and injunctive relief, although the trade secret does not need to be used in interstate commerce. TEX. CIV. PRAC. & REM. CODE § 134A.003 (2019). The term "trade secret" in the DTSA includes "all forms and

types of … technical … or engineering information, including … programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically," if the owner has taken reasonable measures to keep the information secret and the information derives independent economic value from not being generally known. 18 U.S.C. § 1839(3) (2019). "Misappropriation" of a trade secret means:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—

>> (i) used improper means to acquire knowledge of the trade secret;

>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

>>> (I) derived from or through a person who had used improper means to acquire the trade secret;

>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

>>> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

>> (iii) before a material change of the position of the person, knew or had reason to know that—

>>> (I ) the trade secret was a trade secret; and

>>> (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5) (2019). The term "improper means" includes "breach or inducement of a breach of a duty to maintain secrecy." 18 U.S.C. § 1839(6)(A). The TUTSA similarly defines a "trade secret" and "misappropriation." TEX. CIV. PRAC. & REM. CODE § 134A.002 (2019).

140.    The existence of a trade secret is a question of fact. *Glycobiosciences*, 2016 WL 1702674, at *6. "Courts weigh six fact-intensive factors in determining whether a trade secret

exists: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of the measures taken to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Id.

141.     In a civil action brought under 18 U.S.C. § 1836(b) with respect to misappropriation of a trade secret, a court may "grant an injunction to prevent any actual or threatened misappropriation … on such terms as the court deems reasonable" as long as the injunction does not prevent a person from entering into an employment relationship or otherwise conflict with an applicable state law prohibiting restraints of trade. 18 U.S.C. § 1836(b)(3)(A) (2019). However, a court may place conditions on employment based on evidence of threatened misappropriation. Id. The TUTSA also provides for injunctive relief for "actual or threatened misappropriation," but an injunction cannot prevent a person "from using general knowledge, skill, and experience that person acquired during employment." TEX. CIV. PRAC. & REM. CODE § 134A.003 (2019).

### 3.     Computer Fraud and Abuse Act

142.     Anyone who suffers damage or loss by reason of a violation of the Computer Fraud and Abuse Act (CFAA) "may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief" if the loss is in excess of $5,000 in one year. 18 U.S.C. §§ 1030(g), 1030(c)(4)(A)(i)(I) (2019). "Violations of the CFAA include: (1) intentionally accessing a protected computer without authorization or by exceeding authorization and obtaining information from that computer; (2) knowingly (and with an intent to defraud) accessing a protected computer without authorization or by exceeding authorization and obtaining anything in excess of $5,000 in value; and (3) intentionally accessing a protected computer without

authorization and causing damage and loss. 18 U.S.C. §§ 1030(a)(2)(C), 1030(a)(4), 1030(5)(C)." *Frisco Medical Ctr., LLP v. Bledsoe*, 147 F.Supp.3d 646, 658-59 (E.D. Tex. Nov. 30, 2015). "Loss" under the CFAA means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11) (2019) (emphasis added). A "protected computer" means a computer "which is used in or affecting interstate or foreign commerce or communication." 18 U.S.C. § 1030(e)(2) (2019).

143. Courts have held that an employee's authority to access the employer's protected computers is terminated when the employee breaches the duty of loyalty to the employer. *Clean Energy v. Trillium Transportation Fuels LLC*, 2019 WL 1522521, at *2 (S.D. Tex. Mar. 22, 2019); *see Int'l Airport Ctrs. LLC v. Citrin*, 440 F.3d 418, 420-22. (7th Cir. 2006). Additionally, an authorized user of a computer can exceed that authorization by accessing data in a manner that is not permitted by previous agreement to a company policy, such as a policy only permitting access "when necessary to perform job-related duties." *Frisco Medical*, 147 F.Supp.3d at 659.

## B. Argument

144. ABB urgently needs a preliminary injunction against each of the defendants to safeguard and protect any further use or disclosure of ABB's confidential information and trade secrets. ABB can readily satisfy the four elements required for this relief. *First*, the evidence establishes, without controversy, that ABB is likely to succeed on the merits: ABB took reasonable measures to protect the confidentiality of its business information—information which has economic value in part because it is confidential—and that Mr. McKee and Mr. Filiatrault misappropriated this information shortly before leaving their employment with ABB to join JRGO. Mr. Filiatrault bragged that he and Mr. McKee would turn JRGO into a direct competitor of ABB.

- 25 -

*Second*, the nature of the information that has been appropriated by the Defendants establishes a substantial threat that ABB will suffer irreparable harm. *Third*, the balance of equities weighs heavily in ABB's favor. *Fourth*, granting the requested preliminary injunctive relief will not disserve the public interest. Instead, it will only serve to promote fair competition and fair business practices. The declaration of Neal Bishop attached as Exhibit "1" establishes the merits of ABB's request for preliminary injunction.

### 1.    There is a strong likelihood ABB will prevail on the merits.

145.    First, with respect to misappropriation of trade secrets, ABB has demonstrated a strong likelihood ABB will show misappropriation of trade secrets

146.    A trade secret can include all forms and types of information, including business information, technical information, and others, and can include compilations, programs, and software code. 18 U.S.C. § 1839(3); Tex. Civ. Prac. & Rem. Code § 134A.002(6).

147.    ABB has evidence that Mr. Filiatrault and Mr. McKee copied information from their work electronic devices, including their work computers, onto private storage devices. This information appears to include essentially all of ABB's electronically stored information concerning its oil and gas pipeline inspection business. In particular, it includes information concerning ABB's PITware software, its Pricing Information, its Employee Files, and its Fire Tube Files.

148.    For each of these types of information, ABB took reasonable steps to maintain the secrecy of the information. Employees, like Mr. Filiatrault and Mr. McKee, were subject to company policies preventing the use or disclosure of confidential information. ABB further takes steps to protect the confidentiality of this information by restricting access to it, and by enforcing its policies, when needed, through litigation.

149.     In addition, each of these categories of information provides ABB with value, in part because it remains confidential. A direct competitor to ABB would benefit greatly if it had access to the information that has been misappropriated by Mr. Filiatrault and Mr. McKee, as it would provide specific insights into customer pricing, specific knowledge concerning ABB's employees, including their salaries, duties and responsibilities, and insight into a new project, as shown in the Fire Tube Files. Further, Mr. McKee and Mr. Filiatrault have copied substantial amounts, and perhaps all, of the source code of the PITware software. The PITware software is used with every ABB customer in the oil and gas pipeline inspection services. Neither the fundamental structure of the software, and certainly not the details of the code, are available to the public. This software is an important, invaluable tool to ABB in allowing ABB to efficiently and effectively service customers in the oil and gas pipeline industry.

150.     A competitor, or even a potential competitor, would benefit greatly if it had access to the information misappropriated by Defendants. It would provide insight into specific aspects of the oil and gas pipeline services industry, including key pricing information, information about ABB's key employees, and the new Fire Tube File information.

151.     Next, with respect to the Computer Fraud and Abuse Act, ABB has demonstrated a strong likelihood that Defendants violated the Act. ABB can easily establish loss in excess of $5,000 over the past year. Further, it is without question that Defendants Filiatrault and McKee intentionally accessed their work computers and obtained volumes of ABB's confidential and trade secret information from those computers. Neither McKee nor Filiatrault was authorized to copy this information onto non-ABB storage devices, to access for use beyond for ABB's benefit, to copy and post this information onto non-ABB sites, such as the DropBox site.

**2.      There is a substantial threat ABB will suffer irreparable harm without an injunction.**

152.    ABB has suffered and continues to face additional irreparable harm if preliminary injunctive relief is not granted. In summary, irreparable injury or harm is the type of harm for which money damages are inadequate or are "especially difficult" to compute. *Allied Marketing Group, Inc. v. CDL Marketing, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1998). By definition, a "breach of confidentiality and misappropriation of trade secrets is, by its nature, irreparable and not susceptible of adequate measurement for remedy at law." *Glycobiosciences*, 2016 WL 1702674, at *8.

153.    The Defendants have shared ABB's confidential and trade secret information amongst themselves and have posted it to the DropBox site. ABB is not aware that others, however, have yet accessed ABB's trade secrets. Moreover, although Defendants have indicated that they intend and expect to begin competing with ABB (unfairly advantaged by their access to ABB's trade secrets) they have not yet entered the marketplace. At a minimum, a preliminary injunction would allow ABB to restrict the further dissemination of its confidential information and trade secrets. Without the entry of a preliminary injunction, it will be nearly impossible for ABB to calculate monetary damages with specificity.

**3.      The balance of hardships weighs in favor of ABB.**

154.    Plaintiff seeks the narrowly tailored relief designed to protect their legitimate confidential and trade secret business information. The scope of the requested preliminary injunction ensures that only misappropriated information is not used to unfairly disadvantage ABB. If the Court does not intervene, ABB may lose its valuable, and irreplaceable intellectual property, including its trade secrets concerning PITware, Pricing Information, Employee Files, and Fire Tube File information.

155.    In contrast, Defendants will suffer no undue hardship from the entry of a preliminary injunction. Rather, Defendants Filiatrault and McKee must only comply with the basic framework of trade secret law—they cannot use, disclose or copy ABB's confidential and trade secret information. Similarly, JRGO will suffer no hardship with the entry of a preliminary injunction. It is not currently in the business of offering oil and gas pipeline inspections and suffers no prejudice if it is not entitled to use ABB's confidential information.

### 4.    An injunction will not disserve the public interest.

156.    Enjoining the Defendants from any further use, copying or disclosure of ABB's confidential and trade secret information fully serves the public interest. Entry of the preliminary injunction will only promote fair competition, ethical behavior, and competition at a level playing field. By denying ABB's request for entry of a preliminary injunction, the public interest will be disserved. Denial of ABB's motion would suggest to the public that valuable, confidential information may be freely taken and used from employers, without their authorization

### C.    Requested Injunction

157.    The scope of the injunctive relief requested by ABB is narrowly tailored and substantially related to Defendants' conduct. The appropriateness of granting injunctive relief against those who have misappropriated confidential and proprietary information is well recognized. *See Hyde Corp. v. Huffines*, 314 S.W.2d 763, 776 (1958). Indeed, an injunction "must, of necessity, be full and complete so that those who have acted wrongfully … will effectively be denied the benefits and profits flowing from the wrongdoing." *Elcor Chem. Corp. v. Agri-Sul, Inc.*, 494 S.W.2d 204 (Tex. App.—Dallas 1973, writ ref'd n.r.e); *accord Halliburton Energy Servs. V. Axis Techs. LLC*, 444 S.W.3d 251, 260 (Tex. App.—Dallas 2014, no pet.) ("[t]he law is clear that injunctive relief for trade secret misappropriation must be sufficient to protect the plaintiff's legal

rights and remove the competitive advantage obtained through the misappropriation.").

Accordingly, the Court should grant ABB's request for injunctive relief.

158.    ABB seeks preliminary and permanent injunctive relief enjoining Mr. Filiatrault,

Mr. McKee and JRGO from:

    a.    destroying, altering, erasing, secreting or failing to preserve any and all of ABB's business materials, property, proprietary information, confidential information and/or trade secrets, wherever located, in whatever form, including but not limited to any document, email, software, electronic data, tangible evidence and communications;

    b.    disclosing, disseminating, or using for their own purpose or any other purpose ABB's confidential information and trade secrets, including but not limited to all information in their possession, custody, or control;

    c.    accessing, studying, copying, or in any way maintaining any versions of ABB's confidential business information and trade secrets;

    d.    failing to return the information and any electronic communication or storage devices containing, or previously containing, any of ABB's confidential business information or trade secrets; and

    e.    allowing Defendants Filiatrault, McKee and JRGO to call upon, solicit, or accepts business from any customer or potential customer of ABB.

## JURY DEMAND

ABB Inc. hereby demands a trial by jury on all issues pursuant to Rule 38 of the Federal

Rules of Civil Procedure.

## PRAYER FOR RELIEF

ABB respectfully requests that the Court award it:

    a.    injunctive relief as requested above, first as a preliminary injunction, and upon trial as a permanent injunction;

    b.    actual damages;

    c.    exemplary and punitive damages;

    d.    reasonable attorneys' fees, outside fees, and costs of suit;

e.      pre-judgment and post-judgment interest at the highest rate allowed by law; and

f.      all other relief to which it is entitled.

Dated: October 21, 2019                    Respectfully submitted,

Of Counsel:                                Jeffrey A. Andrews
                                           State Bar No. 24050227
Paul B. Hunt                               jandrews@yettercoleman.com
Indiana Atty. No. 15465-71                 YETTER COLEMAN LLP
paul.hunt@btlaw.com                        811 Main Street, Suite 4100
Jeff M. Barron                             Houston, Texas 77002
Indiana Atty. No. 27730-49                 (713) 632-8000
jeff.barron@btlaw.com                      (713) 632-8002 (Fax)
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
(317) 231-1313
(317) 231-7433 (Fax)                       ATTORNEYS FOR PLAINTIFF ABB INC.